IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CRISARLA HOUSTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-3163 |
| | § | |
| TEXAS SOUTHERN UNIVERSITY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is an employment dispute. Crisarla Houston alleges that her former employer, Texas Southern University, and the Dean of the Thurgood Marshall School of Law at TSU, Dean McKen Carrington, violated Title VII, 42 U.S.C. 2000e, *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d), by paying her less than male coworkers and retaliating against her when she complained about it. (Docket Entry No. 25). The defendants moved for summary judgment. (Docket Entry No. 32). Houston responded, (Docket Entry No. 36), and the defendants replied, (Docket Entry No. 39). Based on the pleadings; the motion, response, and reply; summary judgment evidence; and the relevant law, this court grants in part and denies in part the defendants' motion for summary judgment. Specifically, the claims against Carrington are dismissed with prejudice; Houston's Equal Pay Act and Title VII sex discrimination claims against the university are also dismissed with prejudice; and summary judgment is denied as to Houston's Title VII retaliation claim against the university. The reasons for these rulings are explained in detail below.

**I.    Background**[1]

---

[1] The summary judgment record contains: excerpts from Houston's deposition, (Docket Entry Nos. 32, Ex. 3; 36, Ex. 1); Carrington's affidavit, (Docket Entry No. 32, Ex. 1); Houston's contract, (*id.* Ex. 2); a

A year after receiving her law degree from the Harvard Law School, Houston took a job as a legal writing instructor at Texas Southern University's Thurgood Marshall School of Law. She taught two classes per semester and earned $75,000. Beginning with the 2006–2007 school year, Houston served as an assistant professor, a tenure-track position. Her course load remained the same, but she received a raise to $95,000. In April or May 2007, she was appointed dean of the school's legal writing program. As director of the program, she would assume new administrative duties and have her teaching requirement reduced to one class per semester.

Houston understood that she was to begin preparing for the fall semester during the preceding summer. She contacted Carrington about being added to the summer payroll on July 10, 2007. (*See* Docket Entry No. 36, Ex. 2). On July 20, 2007, Houston received her formal offer of employment as director of the legal writing program. (Docket Entry No. 36, Ex. 3). Certain terms were not what she expected. The contract called for her to teach four courses each year, not a reduced load of two; produce three publications to be considered for tenure, not two; and serve on two committees, not one. She changed the offer to match her expectations, signed it, and returned it.

On August 1, Houston e-mailed Carrington to tell him that the changes she had made to her

---

December 7, 2007 letter from Carrington to Houston, (*id.* Ex. 4); Houston's resignation letter, (*id.* Ex. 5; Docket Entry No. 36, Ex. 11); an article about Houston's appointment at Florida A&M University's law school, (Docket Entry No. 32, Ex. 6); the contract of Cassandra Hill, the law school's current director of legal writing?, (*id.* Ex. 7); a July 10, 2007 e-mail from Houston to Carrington, (Docket Entry No. 36, Ex. 2); a July 20, 2007 employment offer letter from Carrington to Houston, (*id.* Ex. 3); an August 2, 2007 e-mail from Carrington to Houston, (*id.* Ex. 4); excerpts from Carrington's deposition, (*id.* Ex. 5); an October 31, 2007 e-mail from Carrington to Houston, (*id.* Ex. 6); a November 21, 2007 e-mail from Houston to Carrington, (*id.* Ex. 7); a December 7, 2007 letter from Carrington to Houston, (*id.* Ex. 8); a February 12, 2008 complaint filed by Houston against Carrington, (*id.* Ex. 9); a February 12, 2008 reprimand issued by Carrington to Houston, (*id.* Ex. 10); and a May 15, 2007 letter from Carrington to Houston accepting her resignation, (*id.* Ex. 12).

2

copy of the contract were not reflected in the new version she received. (*Id.* Ex. 4). Carrington responded the next day, as follows:

> The model for the law school faculty/administrative position is the law school associate dean position. I find it best to establish law school faculty administrators in a bifurcated way — faculty responsibility and administrative responsibility. The advantage of this arrangement is to ensure that the tenure track position is firmly established as a separate entity independent of the administrative. Under TSU rules, when an administrat[or] ceases to serve as an administrator, the total salary is reduced by up to 25 %. Without the bifurcation, the tenure track portion of the salary would be reduced. This is undesirable. As such, I make the director position a separate entity from the professor's position. The faculty portion is governed by the tenure track process and the administrative portion is governed by the staff process. Although at some point the two merge to a combined salary, the faculty side is separated from the administrative side.
>
> So far, I have only completed the tenure track side of your appointment. As I stated previously, I will complete the directorship portion separately and do the necessary paperwork to finalize the administrative appointment.

(*Id.*). Carrington sent a letter to Houston dated December 7, 2007, confirming that her course load would be cut in half to allow her to complete her administrative duties. (*Id.* Ex. 8). In addition, he informed her that "[l]ike other faculty directors at the law school, the directorship carries a summer administrative workload. This summer workload carries a salary of $15,000 for this time period." (*Id.*). Houston maintains that she was initially promised that the summer administrative work would earn her $20,000 to $25,000 above her $95,000 base salary. She also asserts that she was to be paid the stipend for work during the summer before the 2007 fall semester. Houston asserts that the other assistant deans, who were men, were paid for summer work. The university does not dispute that the other deans were paid for summer work, but asserts that they were paid under different circumstances. The university asserts that no dean was ever paid for summer work *before* the

contract term, which is what Houston requested. (Docket Entry No. 32, Ex. 1 ¶¶ 5–6).

During Houston's exchanges with Carrington about her contract, she met with Charlene Evans, the university's ombudsperson. At first, their meetings were one-on-one, but later meetings included three other female professors at the law school. In the one-on-one meetings, Houston did not complain to Evans that she believed she was receiving lower pay than similarly situated male professors. In the group meetings, however, sex-based pay disparities were discussed. (Docket Entry No. 36, Ex. 1 at 77–82). After Houston began her meetings with Evans, Carrington commented to her that he was "tired of you people going across campus to HR to complain about me." (*Id.* at 59).

Houston states that Carrington began a series of retaliatory actions after she began meeting with Evans. On October 31, 2007, Houston received an e-mail from Carrington criticizing her for not posting her office hours and for conducting a mid-semester evaluation of a faculty member. (Docket Entry No. 36, Ex. 6). During the 2008 spring semester, Houston was assigned the largest legal-writing section. (Docket Entry No. 36, Ex. 1 at 43–51). She had previously declined Carrington's request to teach a second section because she did not think the work load would be manageable. (*Id.* at 42–43). The size of her section's enrollment rose from between 20 and 25 students to almost 40 students. (*Id.* at 43). Houston also alleges that Carrington encouraged students to fill out a petition complaining about her changing the date an assignment was due. Carrington placed the petition in her personnel file. (*Id.* at 104–06).

On February 12, 2008, Carrington issued a written reprimand to Houston. (Docket. Entry No. 36, Ex. 10). The reprimand identified six "incidents of concern": two incidents in which she did not cooperate with him in resolving a dispute she had with another professor; turning in grades

4

late, failing to post office hours promptly; and two improper faculty evaluations. (*Id.*). The same day, Houston sent a complaint to Lydia Borbin, the university's assistant director of human resources. (*Id.* Ex. 9). Houston's complaint charged that Carrington had "acted in a retaliatory manner with the aim of intimidating me." The complaint referred to the university's anti-retaliation policy. The complaint alleged that "Dean Carrington has taken adverse employment actions against me after he discovered that I spoke to Dr. Charlene Evans, the Executive Vice President and Texas Southern University Ombudsperson, on several occasions." (*Id.*).

Houston sent Carrington a letter of resignation dated April 7, 2008. (Docket Entry No. 36, Ex. 11). The letter set her final work day as June 30. (*Id.*). Shortly before, Houston had accepted an offer to join the faculty at Florida A&M University's law school. (Docket Entry No. 36, Ex. 1 at 168–71). Carrington responded on May 15, 2008, writing that "Texas Southern University accepts your resignation effective the end of the academic year, which is May 31, 2008." Houston alleges that making the resignation effective a month earlier was a "final act of retaliation." (Docket Entry No. 36 at 5).

Houston sued Carrington and the university on October 24, 2008. (Docket Entry No. 1). She alleges retaliation and sex discrimination under Title VII, violation of the Equal Pay Act, and breach of contract under Texas law. In an amended complaint filed on June 22, 2010, she removed her breach-of-contract claim. (Docket Entry No. 25). Carrington and the university have moved for summary judgment on all claims. (Docket Entry No. 32).

## II. The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

**III.    Analysis**

    **A.    Houston's Claims against Carrington**

The defendants argue that all claims against Carrington under Title VII and the Equal Pay Act should be dismissed because he is not an employer subject to liability under those statutes. "Only 'employers,' not individuals acting in their individual capacity who do not otherwise meet the definition of 'employers,' can be liable under [T]itle VII." *Grant v. Lone Star Co.*, 21 F.3d 649, 652 (5th Cir. 1994). The same is true under the Equal Pay Act. *Wardlaw v. City of Philadelphia Street's Dept.*, 378 F. App'x 222, 224 (3d Cir. 2010) (per curiam) (unpublished); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1172 n.17 (11th Cir. 2003). Houston appears to have abandoned her claims against Carrington, making no mention of them in her response. In any event, she has not met her summary judgment burden because she has not pointed to any evidence that Carrington is covered by either statue.

    **B.    Houston's Equal Pay Act Claim**

The Equal Pay Act prohibits employers from discriminating on the basis of sex by paying wages to employees of one sex "at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). An essential element of this claim is that the plaintiff was paid less than a similarly situated male performing comparable work. *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993) (citing *Jones v. Flagship Int'l*, 793 F.2d 714, 722–23 (5th Cir.1986)).

Houston argues that male professors who were associate deans working over the summer are similarly situated to her. She alleged that she was not paid for the work required to prepare to

assume her new duties in the fall, while male professors who were associate deans were paid for summer work. According to Carrington, Houston has misunderstood the policy and practice. "[T]he opportunity to perform work in the summer semester occurs during the latter portion of a professor's contract period, and does not precede the professor's contracted time period." (Docket Entry No. 32, Ex.1 ¶ 5). Although Houston has presented evidence that other professors compensated as associate deans are paid for summer work, she has presented no evidence to controvert the university's evidence that no professor receives compensation for preparatory work before the start of a contract for the associate-dean position. Houston has not created a genuine issue of material fact as to the existence of similarly situated male coworkers. Houston's Equal Pay Act claim is dismissed.

### B.    Houston's Title VII Claims

#### 1.    The Sex Discrimination Claim[2]

Under Title VII, it is unlawful to "discharge any individual, or otherwise to discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); *Smith v. Xerox Corp.*, 602 F.3d 320, 326 n.4 (5th Cir. 2010). Under Fifth Circuit precedent, "only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating" qualify as adverse employment actions that may be the basis for a sex-discrimination claim. *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)). The Fifth Circuit has cautioned courts "not to expand the definition of adverse

---

[2] Houston appears to have abandoned her sex discrimination claim under Title VII, referring only to her retaliation claim in her response. Regardless, summary judgment in favor of the university is appropriate for the reasons explained below.

employment action to include 'events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee — anything that might jeopardize employment in the future.'" *Roberson v. Game Stop/Babbage's*, 152 F. App'x 356, 360 (5th Cir. 2005) (per curiam) (unpublished) (quoting *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 708 (5th Cir. 1997)).

Under this standard, the only adverse employment action Houston has identified for her sex discrimination claim is the allegation of compensation that was less than similarly situated male professors received. Houston's disparate-treatment claim fails for the same reason as her Equal Pay Act claim: she has presented no evidence that a male professor compensated as an associate dean received payment for summer work performed before the start of his contract. Because there is no factual basis that would permit an inference of discriminatory treatment based on her sex, summary judgment is granted as to this claim.

### C. Houston's Retaliation Claim

Houston also alleges that the university retaliated against her for complaining about Carrington's actions. Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because [the employee] has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). The elements of a *prima facie* showing of retaliation under Title VII are that the plaintiff: "(1) engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate nonretaliatory reason for the employment action. *Id.* If the defendant makes this showing, the burden shifts back to the plaintiff to raise a fact issue as to whether the employer's

9

articulated reason for the employment action was a pretext for retaliation or that retaliation was a motivating factor. *Smith*, 602 F.3d at 328–330.

Houston argues that her complaint to Evans about Carrington was protected activity under Title VII. Houston alleges that "Carrington's retaliation included undermining her authority . . . by encouraging other professors not to follow her direction, attempting to convince the Rank and Tenure Committee not to retain Houston on the tenure track, and attempting to force her to teach two research and writing sections in the Spring 2008 semester." (Docket Entry No. 36 at 5). She also alleges that "Carrington accepted her resignation prematurely, cut off her benefits, and refused to pay . . . any of the administrative stipend due Houston." (*Id.*). The university argues that the claim must be dismissed because Houston has no evidence of protected activity under Title VII, or, if there is evidence of protected activity, of any adverse action following protected activity.

"To satisfy the protected activity requirement, an employee must oppose conduct made unlawful by Title VII; complaining of unfair or undesirable treatment not addressed by Title VII will not suffice." *Richard v. Cingular Wireless LLC*, 233 F. App'x 344, 337–38 (5th Cir. 2007) (per curiam) (unpublished) (holding that a complaint about not receiving a job was not protected activity when there was no suggestion that the action resulted from an unlawful activity under Title VII); *see also Moore v. United Parcel Serv. Inc.*, 150 F. App'x 315, 319 (5th Cir. 2009) (per curiam) (unpublished) (filing a grievance that "made no mention of race discrimination" was not a protected activity under Title VII); *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (unpublished) (complaint of harassment, but not based on a factor prohibited by Title VII, was not protected activity).

Houston relies on pages 79–81 of her deposition as evidence that she "engaged in protected

10

activity by complaining to . . . Evans that she was being treated from similarly-situated male law school administrators." (Docket Entry No. 36 at 6). The university argues that this testimony fails to show that Houston reported any sex discrimination. The deposition excerpt shows that Houston had individual and group meetings with Evans and that the group meetings took place after the individual meetings. (*See* Docket Entry No. 36, Ex. 1 at 78 l 25–79 l.6. The group meetings involved Houston and three other female professors at the law school, Edith Woo, Marguerite Butler, and Anya Anga. (*Id.* at 78 ll.7–12). Houston testified that the group meetings took place in the fall of 2007, starting some time between September and November. (*Id.* at 79 ll.2–6). The deposition then turned to the content of her communications with Evans:

> A. You asked who spoke you asked what were the topics?
> Q. Yes, and mainly in that first meeting with Dr. Evans when y'all met as a group for the first time, do you remember what topics were discussed at that meeting?
> A. Yes. Each of us had our own issues. One would be that not being paid similarly to what other situated male law professors had been paid or being promised to be paid by Dean Carrington and doing the work and not getting paid.
>      So, from a — I think you want a bird's-eye view, generally of what we were talking about. Those were the things — unequal pay, and then just the retaliation that took place that each of us was experiencing in our own way because we had either filed a complaint with the general counsel's office, filed a complaint through the human resources department, or filed a complaint through the president's office. . . .
> Q . . . . It doesn't sound like so far that you in your individual basis raised any complaints about not being paid similarly to your male counterparts at the institution. Is that —
> A. To Dr. Evans?
> Q. Right?
> A. No, because as I said, the individual meetings ended around September or October. So I was still meeting with Dean Carrington to see if I could get him to put the contract in writing. I had not . . . come to the conclusion yet that there would be no contract and there would be no pay by

11

>September or October. Because the school year had only started in August.

(*Id.* at 81 l.5–82 l.22). The deposition does not make clear when Houston determined that Carrington was not going to give her a contract in the amount she believed they had agreed to.

Although the testimony could be clearer, it reasonably supports an inference that Houston, with others, complained to Evans that she and other women on the law school faculty and administration were not being paid the same as men. The university construes the last question-and-answer exchange as a specific disavowal that Houston told Evans that she thought she was being paid less because of her sex. This reads too much into Houston's answer. She indicated only that she did not tell Evans in the individual meetings that she was experiencing discrimination herself, because those individual meetings took place before she got detailed information from Carrington on her contract. Houston specifically referred to the "individual meetings" in her answer. At the beginning of this section of her deposition, she explained that the group meetings started later in the year, after the September to October period mentioned in her last answer. Houston did not disavow having such discussions with Evans in the group meetings. Houston testified that the women taking part in the group meetings complained to Evans that they and other women were not being paid the same as the men at the university. Houston has met her summary judgment burden to show that she engaged in protected activity.

The university argues that Houston cannot show retaliation because the decision not to pay her took place before she engaged in any protected activity. This argument overlooks the other actions that Houston alleges took place after she complained to Evans, including giving her the largest writing section in the spring semester, refusing to back her in a dispute with another writing professor, and issuing a written reprimand. The university has not argued that these actions are too

12

trivial to be the basis of a retaliation claim. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (defining an adverse employment action as one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" and excluding ""petty slights or minor annoyances that often take place at work and that all employees experience"); *McCoy*, 492 F.3d at 559. Summary judgment is not appropriate as to the Title VII retaliation claim.

### III.     Conclusion

The defendants' motion for summary judgment is granted in part. The claims against Carrington are dismissed with prejudice. Houston's Equal Pay Act and Title VII sex discrimination claims against the university are also dismissed with prejudice. Summary judgment is denied as to Houston's Title VII retaliation claim against the university.

SIGNED on January 5, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge